UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| TAWANDA CHANDLER, *as Personal Representative of the Estate of Christopher Lee*, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 7:23-cv-1174-AMM |
| | ) | |
| TUSCALOOSA COUNTY, ALABAMA, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case is before the court on a motion for summary judgment filed by defendants Sheriff Ron Abernathy and Chief Eric Bailey, Docs. 82–83, which is fully briefed, Docs. 81, 84, 88, 92. There is also the motion of plaintiff Tawanda Chandler, personal representative of the Estate of Christopher Lee, to strike evidentiary material, Doc. 86, which is also fully briefed, Docs. 85, 91, 93–96. For the reasons explained below, the motion for summary judgment is **GRANTED**. The motion to strike is **DENIED AS MOOT**.

## I.    BACKGROUND

In July 2021, the Tuscaloosa County Jail had two units: inmates charged with felonies resided in the pods, and inmates charged with misdemeanors resided in dormitories on a separate side of the jail. Doc. 81-1 at 8; Doc. 81-14 at 8.

On July 8, 2021, LaQuinton Richardson was booked into the Tuscaloosa County Jail on charges of reckless driving and attempting to elude law enforcement. Doc. 81-3 at 2–3. Mr. Richardson was assigned to Dorm 3, an open-bay dormitory with bunk beds. *See* Doc. 81-13 at 12; Doc. 81-16 at 35–36.

Shortly after, Christopher Lee was ordered to serve thirty days in jail for various misdemeanors—possessing a pistol without a permit, obstructing a government operation, and reckless endangerment. *See* Doc. 81-4 at 2–3. So on July 23, 2021, Mr. Lee reported to the Jail, where he was assigned to the same dorm as Mr. Richardson. *Id.* at 3; Doc. 81-13 at 12–13. Jail staff conducted a medical questionnaire, but Mr. Lee failed to report his sickle cell condition, *see* Doc. 81-9 at 2–4, as he had done each of the times he had been booked into the jail prior to his July 2021 booking, *see* Doc. 81-10 at 2–13.

In 2021, when inmates arrived at the jail, they were booked into the jail by a booking officer. *See* Doc. 81-14 at 5. The booking officer asked questions about the inmate's medical history and made a series of observations, which determined where the inmate would be assigned and housed. *Id.* at 5–6, 10–11. The booking officer was supposed to use training and experience to classify the inmate. *See* Doc. 81-1 at 7–8. As explained more fully below, the parties dispute which version of the now-edited prison policy the court should consider as the policy in place in mid-2021. *See* Doc. 83 at 12–13; Doc. 88 at 11–15; Doc. 86. Nevertheless, under the controlling

policy, Mr. Richardson and Mr. Lee were assigned to the same dorm. *See* Doc. 81-13 at 12.

Mr. Richardson explained that he and Mr. Lee knew each other before they were incarcerated, that they were friends, and that they had a dog breeding business together. *See* Doc. 81-11 at 2. Ms. Chandler disagrees. *See* Doc. 88 at 17. Ms. Chandler explained that she knew Mr. Richardson's name from the high school football roster because she was a booster for the football team. *See* Doc. 81-8 at 7. And one of Ms. Chandler's family members "has kids with one of [Mr. Richardson's] relatives." *Id.* But though Mr. Lee wanted to go into the dog grooming business and had purchased a dog from Mr. Richardson's relatives, Ms. Chandler denied that Mr. Richardson and Mr. Lee had a dog breeding business together. *Id.* at 14.

On the morning of August 3, 2021, Mr. Lee and Mr. Richardson ended up in a physical altercation. Doc. 81-5 at 2. One of the other inmates said that "the fight was over women and their hair being natural or unnatural." Doc. 81-12 at 2. Another inmate stated that Mr. Richardson and Mr. Lee "had been arguing all day." *Id.* at 3. Mr. Richardson alleged that Mr. Lee "was saying [words] towards him," so Mr. Richardson "started the altercation because Mr. Lee would have started it otherwise." Doc. 81-5 at 2. But Ms. Chandler contends that this is not true and that her son was "sleeping or resting in his bunk at the time he was assaulted by [Mr.]

3

Richardson." Doc. 88 at 16–17. Assistant District Attorney Grace Prince told Ms. Chandler that the video footage of the altercation shows Mr. Lee sleeping peacefully in his bunk when Mr. Richardson assaulted him. Doc. 84-6 at 6–7.

Detention Officer Knox saw the altercation unfolding, radioed for backup, and attempted to break up the altercation. *See* Doc. 81-1 at 12–13. The officers separated the men, handcuffed Mr. Richardson, and "isolated him." *Id.* at 14. Officer Knox had not been aware of any "beef" between Mr. Richardson and Mr. Lee prior to this fight, nor was he aware of any violent history by Mr. Richardson. *Id.* at 11, 13–14. In fact, Mr. Richardson and Mr. Lee had occupied bunks next to one another for several days with no problems before this transpired. *See* Doc. 81-13 at 12–13.

Mr. Lee arrived at DCH Hospital, and shortly after, he passed away. *See* Doc. 84-6 at 5; Doc. 81-7 at 2–11. A later autopsy revealed that Mr. Lee suffered a heart attack caused by his sickle cell trait. Doc. 81-6 at 9; Doc. 81-7 at 2–11. The autopsy showed that Mr. Lee's cells sickled from the physical exertion of the altercation. *See* Doc. 81-6 at 7–8; Doc. 81-7 at 4.

Before his fight with Mr. Lee, Mr. Richardson had been punished several times during his previous jail stays. In December 2019, Mr. Richardson verbally threatened a detention officer. *See* Doc. 84-2 at 15. After another detention officer escorted Mr. Richardson to the booking office, Mr. Richardson became

noncompliant and "aggressive," "pulling away from officers." *Id.* Mr. Richardson was subdued and disciplined. *See id.*

A few months later, in February of 2020, while Mr. Richardson was waiting to receive medicine, another inmate "shoved [Mr. Richardson] into the door, head first," so the two began to fight. *Id.* at 16. After the detention officers stopped the fight, both inmates received medical treatment at DCH Hospital. *Id.* But Mr. Richardson was "deemed to not be the aggressor," so he was sent back to regular housing. *See id.*

Several weeks later, Mr. Richardson was disciplined for headbutting another inmate. *See id.* at 17.

A few weeks later, Mr. Richardson was disciplined for exposing himself to a female visitor. *See id.* at 18.

Around two months later, Mr. Richardson attempted to look through the windows of the female dorms, and when the detention officer commanded him to stop, Mr. Richardson "stated that he was going to assault" the detention officer. *Id.* at 19.

Less than two weeks later, Mr. Richardson was disciplined for possessing contraband, including pills, roaches, extra blankets, and kite string. *See id.* at 20.

About a month later, Mr. Richardson was disciplined for being the aggressor in an altercation that led to him biting another inmate. *See id.* at 21. That same day,

Mr. Richardson participated in group beatings on two other inmates. *See id.* at 22–23. And a few weeks later, on June 30, 2020, Mr. Richardson assaulted another inmate. *See id.* at 24.

In all, Mr. Richardson was deemed to be the aggressor in three physical altercations. *See* Doc. 81-13 at 11. But between his last assault on June 30, 2020, and the August 3, 2021, assault, there is no record of Mr. Richardson engaging in any assaultive behavior. *See id.* at 11–12.

About a year after the August 3, 2021, incident, Chief Bailey's successor implemented a new inmate classification system. *See* Doc. 84-1 at 5, 10. The new classification system asks a series of questions about the incoming inmate, and the inmate is then "graded by the system, and it gives you a recommendation where – how to classify that inmate." *Id.* "[T]he booking officer now is required to find the answer to each of these nine questions before the inmate is classified," and those nine questions include things like "criminal history, disciplinary issues within the jail, mental health, [and] is the inmate suicidal." *Id.* at 10–11. Now, the jail classification system "give[s] you a long list of who or where [the inmate] can't be housed at that point in time." *See* Doc. 81-1 at 15.

After her son's death, Ms. Chandler sued a host of individuals allegedly responsible for his death. *See* Doc. 1-1. All defendants have been dismissed except for Sheriff Abernathy, Chief Bailey, and Tuscaloosa County. *See* Doc. 78 at 1.

6

Tuscaloosa County moved for summary judgment, and the court resolved that motion in a separate order. *See* Docs. 80, 98–99.

Ms. Chandler has several remaining claims against Chief Bailey and Sheriff Abernathy: (1) state law wrongful death claims against Chief Bailey for failing to stop the fight; (2) a 42 U.S.C. § 1983 claim against Chief Bailey for not timely intervening in or preventing the fight; (3) a 42 U.S.C. § 1983 claim against Sheriff Abernathy and Chief Bailey for failing to have adequate medical screening and housing placement policies; and (4) a 42 U.S.C. § 1983 claim against Sheriff Abernathy and Chief Bailey for failing to train booking officers and/or develop a policy to protect Mr. Lee. *See* Doc. 63 ¶¶ 36–48, 59–81, 90–101.

Sheriff Abernathy and Chief Bailey moved for summary judgment on all claims, arguing that neither of them violated Mr. Lee's rights and that both of them are entitled to qualified immunity. *See* Doc. 83 at 9.

Ms. Chandler responded, explaining that only two of her claims are still at issue: (1) Count VI: a 42 U.S.C. § 1983 claim against Sheriff Abernathy and Chief Bailey for failing to implement proper policies and procedures for inmate classification; and (2) Count IX[1]: a 42 U.S.C. § 1983 claim against Sheriff Abernathy

---

[1] Ms. Chandler errantly labeled this claim "Count VI," though that is a duplicate label, and this claim "should have properly been labeled as Count IX." *See* Doc. 88 at 18–19; Doc. 63 at 18, 23. Accordingly, the court will refer to this claim, alleged in paragraphs 90-101 of the Third Amended Complaint, as Count IX.

and Chief Bailey for failing to properly train jail staff on policies and procedures for inmate classification. Doc. 88 at 18–19. Ms. Chandler "concedes that summary judgment is due to be granted on the other remaining claims against Defendants Abernathy and Bailey." *Id.* at 19 n.62. Accordingly, the court **GRANTS** Sheriff Abernathy and Chief Bailey's motion for summary judgment as to all claims other than Counts VI and Count IX. The court will address the two remaining claims in turn.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.   ANALYSIS

### A. Motion for Summary Judgment

#### 1. Count VI: Implementing Policies and Procedures for Inmate Classification

Ms. Chandler contends that "the Tuscaloosa County Jail lacked appropriate policies and procedures for the medical screening of new inmates." Doc. 63 ¶ 70. And, according to Ms. Chandler, the jail "lacked appropriate policies and procedures for the classification and assignment of inmates to various cells within the jail, as it pertains to the classification and assignment" of inmates like Mr. Richardson (who had a documented violent history) and Mr. Lee (who had no violent history but had a medical condition). *Id.* ¶ 71. Ms. Chandler maintains that this failure led to inmate-on-inmate violence, and Sheriff Abernathy and Chief Bailey were deliberately indifferent to such risk because they subjectively knew of this risk and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Id.* ¶¶ 73, 79–80.

Ms. Chandler's complaint seems to allege that the jail had inadequate classification not only as to violent history but also as to medical history. *See id.* ¶ 70; Doc. 83 at 21 ("Plaintiff's claim here is vague, but she seems to be suggesting that Lee should have been housed in a different, segregated location because of his sickle cell trait."). But Ms. Chandler's briefing on the motion for summary judgment focuses entirely on the failure of the classification procedure to consider an inmate's history of violence. *See* Doc. 88. And to the extent Ms. Chandler means to allege that Chief Bailey and Sheriff Abernathy had an unconstitutionally deficient procedure for medical screening, the record is devoid of evidence to support that. Chief Bailey and Sheriff Abernathy had a medical screening procedure, evidenced by the fact that Mr. Lee was screened each time he was booked into the jail, and each time he failed to report his sickle cell condition. *See* Doc. 81-9 at 2–4; Doc. 81-10 at 2–13. And even if the medical screening and classification were insufficient, there is no evidence that Chief Bailey or Sheriff Abernathy ever knew of such insufficiency or recklessly disregarded any commensurate risk.

Regardless of how the court construes the claim, Chief Bailey and Sheriff Abernathy contend that they are entitled to qualified immunity. Doc. 82 at 1; Doc. 83 at 15.

"The qualified immunity defense shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (cleaned up). It "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1293 (11th Cir. 2025) (Tjoflat, J., concurring) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *McClinton v. Warden, Baldwin State Prison*, 172 F.4th 1276, 1281–82 (11th Cir. 2026) (cleaned up).

"Once the official makes that showing, then the burden shifts to the plaintiff to prove that qualified immunity does not apply." *Id.* at 1282. "Specifically, a plaintiff must prove two things: that the defendant violated a constitutional right and that the right was clearly established." *Id.* (cleaned up). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (cleaned up). "The salient question is whether the state of the law gave the defendants fair warning that their alleged conduct was unconstitutional." *Id.* (cleaned up).

The Eleventh Circuit has "identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right." *Corbitt*, 929 F.3d at 1312. *First*, the plaintiff can "show that a materially similar case

has already been decided." *Id.* (cleaned up). In the Eleventh Circuit, a right may be clearly established by "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state." *Id.* (cleaned up). *Second*, the plaintiff can show that a right is clearly established if he can show "that a broader, clearly established principle should control the novel facts of a particular situation." *Id.* (cleaned up). In this scenario, "the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (cleaned up). *Third*, a plaintiff may show that a right is clearly established if the "case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Id.* (cleaned up).

Chief Bailey contends that on August 3, 2021, he "was in charge of the Jail and was exercising his discretionary authority in performing his duties." Doc. 83 at 19. And Ms. Chandler does not dispute that either of the defendants were exercising their respective discretionary authority. *See* Doc. 88.

Chief Bailey and Sheriff Abernathy assert that, "[i]t is unclear in [Ms. Chandler's] Complaint whether this is a *Monell* claim or one for individual 42 U.S.C. § 1983 liability." Doc. 83 at 21. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates

on the basis of respondeat superior or vicarious liability." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (cleaned up). So if Ms. Chandler wants to hold Sheriff Abernathy and Chief Bailey "liable for constitutional violations[, she] must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *See id.*

"Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners." *Id.* "[P]rison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (cleaned up). "Not every injury suffered by one inmate at the hands of another, however, translates into a constitutional liability for prison officials responsible for the victim's safety." *Id.* (cleaned up). "To establish a § 1983 claim for deliberate indifference, a plaintiff must show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Id.* (cleaned up).

"The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the plaintiff to show

13

conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Id.* (cleaned up).

Then, "to establish liability on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective element." *McClinton*, 172 F.4th at 1282 (cleaned up). "First, he must demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious . . . ." *Id.* (cleaned up). Second, "the plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law." *Id.* (cleaned up). "[T]o do that he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff . . . ." *Id.* (cleaned up). But "even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable under the Cruel and Unusual Punishments Clause if he responded reasonably to the risk." *Id.* (cleaned up). In short, "a deliberate-indifference plaintiff must show that the defendant official was subjectively aware that his own conduct— . . . his own actions or inactions—put the plaintiff at substantial risk of serious harm," *Wade v. McDade*, 106 F.4th 1251, 1258 (11th Cir. 2024).

Ms. Chandler contends that the operative inmate classification policy in August 2021 (and the failure to adopt a different policy) created "objective risk of harm" because violent and nonviolent inmates were housed together. *See* Doc. 88 at

14

20. But Ms. Chandler cannot establish that Chief Bailey and Sheriff Abernathy recklessly disregarded a subjectively known risk.

The parties disagree about what the court should consider as the operative classification policy in August 2021. Chief Bailey and Sheriff Abernathy point to a version of Policy and Procedure Directive B-104 that was allegedly "in place at the Tuscaloosa County Jail between July 8, 2021 and August 3, 2021." *See* Doc. 81-17 ¶ 8. This policy directive instructs the booking officer to consider several things when classifying the inmate for housing: mental and emotional stability, escape history, history of assaultive behavior, medical status, age, and need to keep separate. *Id.* at 6–7. Ms. Chandler contends that the court should strike this directive because it was not timely disclosed to her despite her discovery requests and because it is "in direct conflict with the entirety" of the depositions. *See* Doc. 86 ¶¶ 21–23. According to Ms. Chandler, apart from this improperly disclosed policy directive, the evidence shows that as of August 2021, inmates were classified and housed according to only one criterion: whether they were charged with a misdemeanor or a felony. *See id.* ¶ 9.

Officer Knox testified that booking classification was based on the inmate's current charge, regardless whether the inmate had previously been charged with a different level of offense. *See* Doc. 81-1 at 8–9. He also testified that misdemeanants were housed with misdemeanants and felons were housed with felons, regardless

whether they were violent or nonviolent. *See id.* at 9. Chief Bailey testified that as of July 2021, booking officers used "the inmate's current state of mind" and the inmate's charges to determine classification, and when asked if the booking officer considered anything else, Chief Bailey replied, "Not that I can think of." Doc. 81-14 at 6.

Even if the court were to strike the written policy that instructed booking officers to consider things like history of violence, Ms. Chandler's claim fails. Even if the jail used a policy that classified inmates solely by offense level, and even if that policy did pose an objectively serious risk to the inmates' safety (which Ms. Chandler has not established), Ms. Chandler has not produced any evidence that Chief Bailey or Sheriff Abernathy were subjectively aware of such risk and that they recklessly disregarded the need for more thorough classification procedures.

As an initial matter, "[t]o establish deliberate indifference based on a generalized risk, the plaintiff must show that serious inmate-on-inmate violence was the norm or something close to it." *Warden*, 936 F.3d at 1234 (cleaned up). Even if a plaintiff shows "that inmates at [a jail] faced some risk of assaults by fellow prisoners, . . . some risk of harm is insufficient." *Id.* at 1235. "[O]fficials must possess enough details about a threat to enable them to conclude that it presents a strong likelihood of injury, not a mere possibility." *Id.* at 1236 (cleaned up).

16

Ms. Chandler has not shown that violence in the jail was so pervasive or common that Chief Bailey or Sheriff Abernathy did know (or even should have known) that the operative classification policy was ineffective. Nor has Ms. Chandler shown that anyone expressed a safety concern to Chief Bailey or Sheriff Abernathy such that they were aware of pervasive threats. Ms. Chandler simply has not established that Chief Bailey or Sheriff Abernathy were aware of some risk that had a "strong likelihood of injury" rather than a "mere possibility." *See id.* Even if some other claim of deliberate indifference had been made, such as to a specific risk of harm arising from housing Mr. Richardson with Mr. Lee, no evidence exists that Chief Bailey or Sheriff Abernathy were deliberately indifferent to such risks. *First*, they could not be deliberately indifferent to the specific risk of harm to Mr. Lee in sharing a cell with Mr. Richardson because they were not aware of this housing assignment. *See* Doc. 81-17 ¶¶ 2–7; Doc. 81-22 ¶¶ 3–4. *Second*, even if there were evidence that Mr. Lee were exposed to some substantial risk of serious harm due to excessive inmate-on-inmate violence, no evidence exists that Chief Bailey and Sheriff Abernathy failed to respond reasonably to any such risk. *See Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (finding no deliberate indifference where defendants placed an inmate in a cell with "a problem inmate with a well-documented history of prison disobedience [who] had been prone to violence" because "[e]ven assuming the existence of a serious risk of harm and legal causation,

17

the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also draw that inference" (cleaned up)).

In short, the record is entirely devoid of evidence that Chief Bailey or Sheriff Abernathy subjectively knew that their operative classification procedure was ineffective and creating a serious and pervasive risk to inmates. Accordingly, the court—and a jury—have no basis to conclude that Chief Bailey or Sheriff Abernathy ever recklessly disregarded such risk.

Ms. Chandler disagrees. She contends that the training material for new officers included a PowerPoint which stated, "Placing a[n] inmate in a cell with another inmate who is known to be dangerous and violent can be the basis for an injured inmate's successful Section 1983 lawsuit." *See* Doc. 84-7 at 66. According to Ms. Chandler, this proves that Chief Bailey and Sheriff Abernathy subjectively knew that the current classification system posed a substantial risk. *See* Doc. 88 at 23. But this is a bridge too far. Even if Chief Bailey or Sheriff Abernathy did know that housing a violent offender with another inmate could lead to a lawsuit, this does not establish that Chief Bailey or Sheriff Abernathy knew that the classification procedure created or exacerbated such a risk. To establish deliberate indifference, Ms. Chandler must show that Chief Bailey or Sheriff Abernathy were "subjectively

18

aware that **his own conduct**—again, his own actions or inactions—put the plaintiff at substantial risk of serious harm." *See Wade*, 106 F.4th at 1258 (emphasis added).

Ms. Chandler also argues that Chief Bailey and Sheriff Abernathy "had documentation there on the premises regarding inmates' history of violence" because the incident reports were kept at the jail, but Chief Bailey and Sheriff Abernathy "deliberately ignored these materials." *See* Doc. 88 at 20. Even if Chief Bailey and Sheriff Abernathy knew that such records were accessible but did not incorporate them into the classification procedure, Ms. Chandler still has not shown that Chief Bailey or Sheriff Abernathy recklessly disregarded any subjective knowledge that the classification procedure—which allegedly did not consider such things—was placing inmates at substantial risk.

Ms. Chandler contends that the Eleventh Circuit has denied qualified immunity where a jail "routinely housed dangerous inmates in crowded conditions with non-violent inmates, thereby failing to implement a proper classification system." *See id.* (cleaned up) (quoting *Dickinson v. Cochran*, 833 F. App'x 268, 272 (11th Cir. 2020)). In *Dickinson*, the plaintiff alleged that the jail "routinely housed dangerous inmates in crowded conditions with non-violent inmates, allowed the introduction of contraband by improperly searching inmates, and inadequately supervised inmates." *Dickinson*, 833 F. App'x at 272 (cleaned up). The Department of Justice launched an investigation and sent the jail a letter detailing "constitutional

deficiencies" and recommending various remedies. *Id.* at 269–70 (cleaned up). But those issues allegedly "went unaddressed." *See id.* at 270. Later, a misdemeanant was placed in a cell with an inmate who was "in a rage and out-of-control," whom the officers "knew . . . to be a violent and difficult inmate." *Id.* (cleaned up). Shortly after, the violent inmate stabbed the misdemeanant several times. *Id.* The Eleventh Circuit held that the plaintiff sufficiently alleged that the supervisors "knew about the history of widespread inmate-on-inmate abuse at the jail and failed to do anything about it." *Id.* at 272.

That case is unpersuasive for two reasons. *First*, the case addressed a motion to dismiss, so the court emphasized that "[a]t this early stage in the litigation, [the court] must accept [the plaintiff's] allegations as true." *Id.* at 273. That is not the case here, where Ms. Chandler has had the opportunity to develop a factual record that shows such deliberate indifference, but has failed to do so. *Second*, there is no evidence that Chief Bailey nor Sheriff Abernathy were ever put on notice of any "constitutional deficiencies" within the jail or that the detention officers "inadequately supervised inmates." *See id.* at 270, 272. Nor is there any evidence that Chief Bailey or Sheriff Abernathy were aware of Mr. Richardson's violent history or any other "widespread inmate-on-inmate abuse" at all. *See id.* at 272. Ms. Chandler has not established that based on one inmate's occasions of violence and disobedience, Chief Bailey and Sheriff Abernathy should have known that there was

20

a systemic, serious, and intolerable problem stemming from the jail's classification system. The widespread, horrific conditions at the *Dickinson* jail (of which the *Dickinson* defendants were admittedly aware) are not present here.

And to the extent that Ms. Chandler wants this court to consider the subsequent remedial measures that the jail enacted after August 3, 2021, the court declines to do so. Ms. Chandler seems to argue that because the jail subsequently began asking more thorough booking questions and implemented more advanced booking technology, the August 2021 procedure must have been insufficient. *See* Doc. 88 at 24 ("The ease with which a new procedure was implemented is indicative of how easily preventable was Christopher Lee's death in this case."). As an initial matter, the court doubts the admissibility of this evidence. *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: . . . negligence; . . . culpable conduct; . . . a defect in a product or its design; or . . . a need for a warning or instruction."); *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) ("[E]vidence does not have to be . . . presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form." (cleaned up)). Ms. Chandler has given the court no reason to believe that this evidence could be presented in an admissible form, and the court finds none in the record. Further, the

21

court sees no legal basis for a ruling that a jail's improvement in its classification procedures establishes that the previous procedures were evidence of deliberate indifference.

Because Ms. Chandler has not shown that Chief Bailey or Sheriff Abernathy recklessly disregarded any subjective knowledge that his own actions—implementing and maintaining the classification procedure—created a substantial risk of harm to the inmates, Ms. Chandler has not established deliberate indifference. Chief Bailey and Sheriff Abernathy are entitled to qualified immunity, and the court **GRANTS** the motion for summary judgment as to Count VI.

### 2. Count IX: Training Jail Staff on Policies and Procedures for Inmate Classification

Ms. Chandler contends that "the staff at the Tuscaloosa County Jail charged with the classification and assignment of inmates to particular parts of the jail had not been properly trained in such classification and assignment, specifically with regard to the proper classification and assignment of inmates" like Mr. Richardson (who had a documented violent history) and Mr. Lee (who had no violent history but a medical condition—sickle cell trait). Doc. 63 ¶ 95. Ms. Chandler maintains that this failure led to inmate-on-inmate violence, and Sheriff Abernathy and Chief Bailey were deliberately indifferent to such risk because they subjectively knew of this risk and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Id.* ¶¶ 98–100. Ms. Chandler contends that "a pattern of constitutional violations

by untrained employees at the Tuscaloosa County Jail is apparent from, among other things, the continued instances of violence towards other inmates on the part of Laquinton Richardson." *Id.* ¶ 96. Ms. Chandler insists that Mr. Richardson should have been reclassified or reassigned after the various assaults in which he participated. *See id.*

As explained above, Ms. Chandler's complaint seems to also allege that Chief Bailey and Sheriff Abernathy failed to train the jail staff as to classification based on medical status. *See id.* ¶ 97. But again, there is no evidence in the record that such claim could survive summary judgment.

And as with Count VI, Chief Bailey and Sheriff Abernathy contend that they are entitled to qualified immunity regardless of how the court construes the claim. Doc. 83 at 9.

The parties both cite cases addressing deliberate indifference liability against a municipality. *See id.* at 26 ("This also seems to be a *Monell* claim . . . ."); Doc. 88 at 22 ("Defendants accurately stated the law as it pertains to Plaintiff's failure to train claim."). Under those cases, "[t]o establish a deliberate or conscious choice or such deliberate indifference, a plaintiff must present some evidence that the [supervisor] knew of a need to train and/or supervise in a particular area and the [supervisor] made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (cleaned up). "This high standard of proof is

intentionally onerous for plaintiffs; imposing liability on a [supervisor] without proof that a specific policy caused a particular violation would equate to subjecting the [supervisor] to respondeat superior liability-a result never intended by section 1983." *Id.* at 1351 n.10; *see also Harrison*, 746 F.3d at 1298 ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." (cleaned up)). The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise in a particular area, a [supervisor] is not liable as a matter of law for any failure to train and supervise." *Gold*, 151 F.3d at 1351. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

There are two types of notice that suffice: actual and constructive. *See Gold*, 151 F.3d at 1352 n.12. "Before it may be said that a [supervisor] has made a deliberate choice among alternative courses of action, its policymakers must have had actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* (cleaned up). "This may be demonstrated in one of two ways. First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in

24

recurrent situations." *Id.* (cleaned up). "Alternatively, the need for more or better training may be obvious where a pattern of constitutional violations exists such that the [supervisor] knows or should know that corrective measures are needed." *Id.* (cleaned up).

Ms. Chandler argues that Chief Bailey and Sheriff Abernathy had both constructive and actual notice. *See* Doc. 88 at 23. She contends that Chief Bailey and Sheriff Abernathy had constructive notice because "a materially similar case has already been decided." *Id.* (cleaned up). She points first to *Dickinson*, which, as the court explained above, is not dispositive here.

The other case Ms. Chandler cites is also inapposite. In that case, the Eleventh Circuit held that a plaintiff showed sufficient evidence of deliberate indifference where "the jail had no policy for classifying and segregating the inmates . . . ; that inmates were not assigned to specific cells or beds; that the jail had no written training policy and that [the jailer] had received no professional training at all; and that the jailer was stationed out of eyesight and earshot of the bullpen." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995). The inmates were "not segregated based on their proclivity for violence or the reasons for their confinement." *Id.* at 1581. The supervisor also testified that "he knew that inmate-on-inmate violence was occurring on a regular basis during May 1990 and other

25

periods of overcrowding; [and] also testified that he knew the violence sometimes resulted in injuries requiring medical treatment." *Id.* at 1583.

That is not the case here. The jail did have a classification procedure, even if the procedure was one that Ms. Chandler finds insufficient. The jail did have a written training policy, even if the parties dispute whether the court can consider its specific contents. *See* Doc. 81-1 at 7–8 (testifying that he received written training materials of the jail policies and procedures and that he had to sign a certification that he read them). And even if the inmates were not housed according to their proclivity for violence, they were housed according to "the reasons for their confinement." *See Hale*, 50 F.3d at 1581. There is no evidence that Chief Bailey or Sheriff Abernathy ever had notice that inmate-on-inmate violence was prevalent. Ms. Chandler's expert testified that in his opinion, the jail was overcrowded. *See* Doc. 81-13 at 14. Chief Bailey and Sheriff Abernathy strongly dispute that. *See* Doc. 92 at 7 ("There is no evidence that the dorm Lee and Richardson shared was overcrowded. In fact, there were eighteen (18) available beds on the morning of August 3, 2021 and only fourteen (14) occupants."). Even if the jail was overcrowded on the day that Mr. Lee was assaulted, there is no evidence that Chief Bailey and Sheriff Abernathy ever knew of such overcrowding and recklessly disregarded the attendant risk.

26

Ms. Chandler contends that even if Chief Bailey and Sheriff Abernathy were not on constructive notice, "[t]his is the rare case where Defendants[] were on actual notice of [the] unconstitutional nature of their conduct." Doc. 88 at 23. Again, she points to the PowerPoint training slide that says, "Placing a[n] inmate in a cell with another inmate who is known to be dangerous and violent can be the basis for an injured inmate's successful Section 1983 lawsuit." *See id.* According to her, this PowerPoint slide means that Chief Bailey and Sheriff Abernathy "had actual notice that placing an inmate with a lengthy, documented history of violence into a dormitory with nonviolent individuals serving short sentences for misdemeanors was unconstitutional." *Id.* at 23–24. This is a leap too far. Even if Chief Bailey or Sheriff Abernathy knew that placing a violent offender with a nonviolent inmate could lead to a lawsuit, that does not mean they knew that this was happening, that the training was not preventing this, or that the training materials were insufficient to cover such a situation. Again, they each had to know that **his conduct** specifically created a substantial risk.

Ms. Chandler also contends that "a pattern of similar constitutional violations by untrained employees is present here as well" because Deputy Knox testified that "Defendants' normal practice was for violent and nonviolent individuals to all be housed together." *Id.* at 24. Even if Chief Bailey or Sheriff Abernathy were aware that the offense-based classification system led to some violent offenders being

27

housed with non-violent offenders, there is no evidence that they knew this mixed housing was creating a substantial risk to the inmates. Despite the few instances of Mr. Richardson's altercations, Ms. Chandler cites no evidence of pervasive violence or frequent attacks in the mixed housing that would give Chief Bailey or Sheriff Abernathy subjective knowledge that the classification system and training were insufficient and were contributing to intolerable, widespread violence. And once again, the court declines to consider the subsequent remedial measures cited by Ms. Chandler.

Accordingly, because Ms. Chandler has not shown that Chief Bailey or Sheriff Abernathy were subjectively aware of a substantial risk caused by the training method, and in turn, has not shown that they recklessly disregarded such risk, Ms. Chandler cannot establish deliberate indifference. Accordingly, Chief Bailey and Sheriff Abernathy are entitled to qualified immunity. So the court **GRANTS** summary judgment as to Count IX.

### B. Motion to Strike

As explained above, Ms. Chandler moved to strike certain portions of Chief Bailey's affidavit and the attached exhibit, which allegedly shows the classification policy directive in place in August 2021. *See* Doc. 86. Because Sheriff Abernathy and Chief Bailey are entitled to qualified immunity and therefore summary judgment

regardless whether the court considers the evidence that Ms. Chandler seeks to strike, the court **DENIES AS MOOT** the motion to strike.

## IV.   CONCLUSION

For the reasons explained above, the court **GRANTS** the motion for summary judgment. Doc. 82. The court also **DENIES AS MOOT** the motion to strike. Doc. 86.

**DONE** and **ORDERED** this 30th day of June, 2026.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

29